OPINION OF THE COURT
William P. Polito, J.
This action was brought on or about January 11, 2005 to recover possession and sale of a 2003 Ford Expedition automobile, or, in the alternative, damages for its conversion.
There was and is a pending action previously commenced on March 5, 2004 for the same relief in Supreme Court, Commercial Part, against the dealer, Page One, and the defendant herein, Mark Palumbo, in which action the plaintiff obtained and entered a summary judgment against them on June 18, 2004 in the amount of $477,029.39.
Parties’ Positions
Plaintiff seeks summary relief by way of order to show cause signed January 21, 2005 and returnable February 15, 2005 asserting its entitlement to repossession and foreclosure of its first security interest and its judgment lien.
Defendant Kimberly Palumbo maintains that, as a bona fide purchaser of Page One, her title to the vehicle is exempt from the security interest of Genesee Regional, if any, pursuant to UCC 9-320, and as title owner her vehicle is not subject to any judgment obtained against the dealer, or the guarantor, Mark Palumbo.
Xerox Credit Union maintains that it has a prior security interest by virtue of the assignment of a purchase money retail installment contract assigned from the dealer on February 3, 2004, and the subsequent issuance of a Maryland certificate of title on December 29, 2004 showing its lien interest, and, therefore, its preference as a perfected security lienor under UCC 9-303.
Decision
Genesee Regional Bank’s motion for seizure of the vehicle is granted pursuant to CPLR 7102.
Facts
Plaintiff established a security interest in current and later acquired collateral pursuant to a floor plan line of credit agreement with Page One dated July 1, 2001. (Exhibit K of Benedict affidavit, Dec. 17, 2004; exhibits A, B, C of plaintiff’s mem, *825 dated May 5, 2005.) Plaintiff has not submitted proof that it perfected its security interest by the filing of a UCC-1 statement. On September 23, 2003 Page One applied for and received a loan of $29,990.80 from Genesee Regional Bank for the purchase of the subject vehicle, a 2003 Ford Expedition, in accordance with said floor plan line of credit agreement. The “Vehicle Cash Purchase Agreement” with Brockport Ford designated the purchase as a “new” vehicle with five miles thereon for $37,476 (net price of $31,988.50 after a $5,500 rebate and $12.50 tire fee). (Exhibit A of Palumbo affidavit, Apr. 13, 2005; exhibit A of Palumbo affidavit, Feb. 22, 2005.) The application states that the requested loan represents 80% of its value as a “brand new vehicle.” The invoice price of the vehicle was $40,000 and the sticker price was $44,000. (Exhibits D, E of plaintiffs mem, dated May 5, 2005.) An MV-50 certificate of sale No. 19976583 was issued also identifying the vehicle as a “new vehicle.” (Exhibit H attached to Benedict affidavit, Dec. 17, 2004.)
The practice engaged in by Page One and the lender to protect and secure the lender’s interest in the vehicle was the retention by the lender of the original title document, viz., the manufacturer’s certificate of origin, until the sum owed on the vehicle was tendered. (Aug. 3, 2004 examination before trial [EBT] of Mark Palumbo at 21, 22, 27, 28, 29, attached as exhibit C to Benedict affidavit, dated Apr. 19, 2005.) Such a document is the title document used for a new vehicle transfer and is necessary and required to be filed in order to record title in New York State either to the dealer, Page One, or from Page One to its purchaser. (No. 4 of Benedict affidavit, dated Apr. 26, 2004, which is attached as exhibit D to Benedict affidavit, dated Dec. 17, 2004; 15 NYCRR 78.11; Chrysler Credit Corp. v State of New York, 262 AD2d 768, 769 [3d Dept 1999].)
First Contract with Kimberly Palumbo
On September 23, 2003, the same day it purchased the new vehicle from Brockport Ford, Page One then allegedly resold the vehicle to the defendant Kimberly Palumbo as a “used vehicle.” Page One designated the vehicle as a “used vehicle” in all of the documents. (Sept. 23, 2003 vehicle cash purchase agreement, exhibit B of Palumbo affidavit; Sept. 23, 2003 retail installment contract, exhibit C of same affidavit; exhibit C of Palumbo affidavit, Feb. 22, 2005.) An MV-50 certificate of sale was issued by the dealer and signed by the purchaser, Kimberly Palumbo, which also designated the vehicle as “used” with 41 miles, and *826 further certified that the sale took place on September 23, 2003. (Exhibit C of Palumbo affidavit, Feb. 22, 2005.) The retail installment contract between the parties also designated the auto as a “used” vehicle with 41 miles. Page One was not authorized by New York State to sell new vehicles to retail customers. (Vehicle and Traffic Law § 415 [1] [f]; [3] [b].) Despite its characterization in the documents to the contrary by the parties, the vehicle here is defined by law to be a “new motor vehicle.” (Vehicle and Traffic Law § 415 [1] [h]; 15 NYCRR 78.13 [a].)
Kimberly Palumbo dealt with her spouse, Mark Palumbo, who was the sole principal, director, stockholder, officer, and an employee of Page One Corp.
Kimberly Palumbo purportedly took possession of the vehicle on September 23, 2003, and operated it using the dealer’s license plates under the issuance of a five-day temporary registration by the dealership. She lived with Michael Palumbo and also owned a second vehicle besides the trade-in vehicle. (Aug. 3, 2004 EBT at 7, and Nov. 30, 2004 EBT at 626-629, attached as exhibit C to Benedict affidavit, dated Apr. 19, 2005.)
Financing for First Sale to Kimberly Palumbo
At the time of purchase on September 23, 2003, the “Vehicle Cash Purchase Agreement” stated a purchase price of $32,000 plus $20 to the dealer for its filing of the registration/title, and $577.50 sales tax totaling $32,597.50 less a $25,000 trade-in vehicle leaving a cash price of $7,000 upon which the sales tax was calculated. (Exhibit B of Palumbo affidavit, Apr. 13, 2005.) After adding back the amount owed on the trade-in vehicle of $25,000, the purchase price was restored to $32,597.50. The seller by virtue of a sales retail installment contract took back a purchase money security interest in the auto to secure payment of the vehicle over several years of installment payments. A purchase money security interest is perfected when signed and does not require filing. (UCC 9-309.) That security interest held by Page One was then assigned to U.S. Bank in return for which Page One received the total agreed purchase price of $32,612.50. (Exhibit C of Palumbo affidavit, Apr. 13, 2005; exhibit C of Palumbo affidavit, Feb. 22, 2005.) Page One expressly represented therein to the lender, U.S. Bank, it had good title, and that U.S. Bank was the first secured lienor. The monies received were not used to pay off the existing first lien of Genesee Regional, nor was the title document (i.e., manufacturer’s certificate of origin) which was necessary to transfer title in New *827 York State requested, or received from Genesee Regional, or filed or signed over to the purchaser.
It was the dealer’s responsibility to file the ownership documents with the MV-50 with the Department of Motor Vehicles for issuance of a registration and/or title to the purchaser and to record the lienholder’s interest. (15 NYCRR 78.11 [¶] [3]; affidavit of Mark Palumbo, May 30, 2005, No. 4.) The dealer collected $20 for this purpose on two occasions, on September 23, 2003 and February 3, 2004, from Kimberly Palumbo.
Second Contract of Sale to Kimberly Palumbo
On February 3, 2004, over five months later, and after the dealer was in default of its floor plan loan, the dealer and the owner again signed a purchase agreement of the same vehicle which it continued to designate as a “used” vehicle with 2,993 miles for $31,787. (Exhibit B attached to Palumbo affidavit, Feb. 22, 2005; exhibit B attached to Lamay affidavit, Apr. 18, 2005.) The price again included another $20 for the dealer to file registration/title on behalf of buyer and a cash deposit of $2,800 with a net balance of $28,987. The MV-50 represented that the sale took place on February 3, 2004.
Financing for Second Sale
A second retail installment contract was signed for the said price plus a $15 VSI fee bringing the balance to $29,002. (Exhibit E attached to Palumbo affidavit, Feb. 22, 2005; exhibit F attached to Benedict affidavit, Dec. 17, 2004.) The dealer represented therein it held the purchase money security interest, which it had previously assigned to U.S. Bank. A promissory note dated February 2004 was also signed by buyer to dealer. (Exhibit G attached to Benedict affidavit, Dec. 17, 2004.) The dealer assigned that purported installment contract and note to Xerox Credit Union for $29,002. The buyer asserts that the purpose of the second sale and retail installment contract was for her to procure a lower interest rate than the rate on the outstanding loan assigned previously to U.S. Bank by the dealer. (Exhibit J attached to Benedict affidavit, Dec. 17, 2004.) The Xerox funds were used to pay the outstanding U.S. Bank’s second lien in the amount of $31,787.06. (Exhibit F, Palumbo affidavit, Feb. 22, 2005.) Further, a second MV-50 was improperly issued, which designated the sale as a “used car” with 2,993 miles and certified that the sale occurred on February 2, 2004. (Exhibit I attached to Benedict affidavit, Dec. 17, 2004.) Again, no funds were used to pay the first lienor, Genesee Regional, nor was the title document, viz., certificate of origin, which was *828 necessary for title transfer, requested or procured from the lender, Genesee Regional. The vehicle continued to be operated by the buyer improperly beyond the five-day allowable period under the dealer’s temporary registration and plates. (Vehicle and Traffic Law § 416.)
On the February 3, 2004 sale date, the dealer was experiencing financial problems. Mark Palumbo, the principal acting on behalf of the corporation, was also personally experiencing serious financial problems at the time of the second February 2004 contract of sale to his wife. The January and February 2004 payments to Genesee Regional had not been made by the dealer. (No. 24 to Benedict affidavit, Mar. 5, 2004; a lawsuit had been commenced on March 15, 2004—exhibit Z and No. 3 of said affidavit; also see Apr. 26, 2004 Benedict affidavit, No. 4, No. 5 attached as exhibit D to said affidavit.) And, plaintiff was seeking recovery of its collateral including the subject auto.
Attempts to Obtain Title in New York State
Kimberly Palumbo, subsequent to the first September 23, 2003 sale, attempted to have the vehicle titled to her in New York State. However, she was unable to do so since the title document (the manufacturer certificate of origin) had not been procured from Genesee Regional, and signed over to her by Page One. The title document was still being held by the lender as security for its outstanding loan and lien in the vehicle. (No. 22 of Palumbo affidavit, Feb. 22, 2005.) The Department of Motor Vehicles after investigation advised Kimberly Palumbo by letter dated November 4, 2004 that the dealer was not in violation of the Vehicle and Traffic Law or the Commissioner’s regulations. It advised that any further recourse against the dealer required court action and suggested Small Claims Court as the venue. (Exhibit H attached to Palumbo affidavit, Feb. 22, 2005.)
Title Issued in Maryland
The purchaser did not pursue the November 4, 2004 recommendation, but instead, apparently with the cooperation of Page One, applied to and received from the State of Maryland a certificate of title issued in her name as owner of the vehicle dated December 29, 2004, and specifying Xerox Credit Union as a first lienor with 10,297 miles on the vehicle. Her address was listed as 1318 High Ridge Drive, Westminster, Maryland 21157. (Exhibit F attached to plaintiff’s mem, dated May 5, 2005.) Her Maryland application now represented the purchase as a “new vehicle” with 10,297 miles for $31,787, that she was residing in *829 Maryland at 1318 High Ridge Drive, Westminster, Maryland 21157, and that the vehicle was not yet located in Maryland. (Exhibits F, G attached to Lang affidavit, Apr. 18, 2005.)
Title Certificate Issued in New York State
On January 25, 2005 this court issued an order to show cause temporarily restraining the defendants from any transfer of the vehicle. The order was served on all defendants on or about January 29, 2005. By application dated February 8, 2005 (exhibit F, Lang affidavit, Apr. 18, 2005), the vehicle title was thereafter transferred in violation of the restraining order into a New York State certificate of title, setting forth the same owner and lienor as the Maryland certificate of title, presumably accomplished through 15 NYCRR 20.5 (c).
Lack of Submission of Title Documents
Based on the submissions, it is not clear what title documents, if any, were used to satisfy Maryland as to Kimberly Palumbo’s ownership. The Maryland application was represented to Maryland Department of Motor Vehicles to be a “new vehicle,” even though the parties previously represented the same vehicle in the first September 23, 2003 sale and in the second February 3, 2004 sale to be a “used vehicle.” The undated statement of a Brockport Ford representative (exhibit.I to Lang affidavit), which plaintiff alleges to be part of the February 8, 2005 Maryland application by Kimberly Palumbo, states that part 3 of the MV-50 No. 19976583 of September 23, 2003 used in the prior sale from Brockport Ford to Page One was in possession of the dealer, Page One. The court does not understand the relevance of that MV-50 to the subsequent second transfer to Kimberly Palumbo. However, the affidavit of Mark Palumbo contradictorily states that all dealer’s MVs were turned over to New York State by the end of March 2004. (Palumbo affidavit, May 3, 2005, No. 3.)
However, the most relevant fact is that Mark Palumbo admits that the necessary title document held by the lender, Genesee Regional, had never been turned over to Page One, or the buyer, or filed (Palumbo affidavit, Feb. 22, 2005, No. 20; Palumbo affidavit, May 3, 2005, No. 5; Palumbo affidavit, Apr. 13, 2005, No. 13), and was still in the lender’s possession. Kimberly Palumbo has likewise conceded that possession of that necessary title document had never been assigned or turned over to her and still remains with the lender Genesee Regional Bank. (No. 11 of Kimberly Palumbo’s attorney affirmation, dated Apr. 13, 2005; Benedict affidavit, dated Dec. 17, 2004, Nos. 14, 15.) She knew *830 the necessary title document was in the possession of Genesee Regional when she registered the vehicle to herself as owner in Maryland in February of 2005 because she had previously filed a complaint with the Department of Motor Vehicles in November of 2004 based thereon.
Findings of the Department of Motor Vehicles
In a recent Department of Motor Vehicles administrative hearing held on June 15, 2005, pursuant to Vehicle and Traffic Law §§ 2127 and 2108 (c), the Administrative Law Judge made findings of fact relevant to this vehicle based upon admissions by Page One. The confirmatory facts relevant to this proceeding to which collateral estoppel (Siegel, NY Prac § 457, at 769 [4th ed]) and judicial admissions (Prince, Richardson on Evidence § 8-215 [Farrell 11th ed]) apply are as follows:
“As of September 17, 2004 Page One Auto Sales Inc. has never registered or titled this vehicle to itself. Therefore, it could not sell the vehicle as a ‘used vehicle.’
“As of September 17, 2004 the vehicle was never registered or titled to Kimberly A. Palumbo . . . because the dealer never had possession of all documents required to register or title this vehicle. Kimberly A. Palumbo filed complaint number 5DEA4-21717 because of this problem.”
Page One improperly sold a new motor vehicle to Kimberly A. Palumbo without a dealer’s certificate of registration as a new motor vehicle dealer or as a qualified dealer. (Exhibit D attached to Benedict affidavit, dated Apr. 19, 2005; NY State Dept of Motor Vehicles Finding Sheet, dated May 19, 2005; Commissioner of Motor Vehicles Notice of Revocation, dated July 5, 2003; Commissioner of Motor Vehicles Order of Civil Penalty, dated July 5, 2005.) Based thereon the regulations reserve to the courts the authority to determine lien validity and priority. (15 NYCRR 20.19.)
Law and Rationale
New York law is applicable by agreement and statute. (UCC 9-303, 9-301; Vehicle and Traffic Law § 2118 [c] [1]; July 1, 2001 commercial security agreement No. 28 applicable law.) UCC article 9 governs the parties’ interest in the relevant collateral. Vehicles owned by car dealers and held for sale are exempt from application of the Uniform Vehicle Certificate of Title Act. (Vehicle and Traffic Law § 2102 [a] [2].) For a dealer authorized to sell new vehicles, a “Manufacturer’s Certificate of *831 Origin” is the title document used to establish proof of ownership in a new vehicle as well as for filing purposes to issue a certificate of title to the buyer thereof. (Chrysler, supra, 262 AD2d 768, 769 [1999].) Brockport Ford was registered to sell new vehicles. For a dealer not authorized to sell new vehicles, the dealer would need to first procure a certificate of title for autos in New York State and then use that title document for transfer purposes. (15 NYCRR 20.5 [b].) Accordingly, title to the subject vehicle passed to Page One by virtue of the September 23, 2003 delivery of that title document from Brockport Ford, i.e., manufacturer’s certificate of origin, to Page One. Assumedly, it was signed over to Page One. Further, notwithstanding the retention by Genesee Regional of the original title document, the agreement between Genesee Regional and Page One states, “[0]wner is and shall remain the sole owner of the collateral.” (6 [a] commercial security agreement, dated Sept. 1, 2001.) Therefore, Page One held a voidable title.
By virtue of the floor plan agreement and subsequent loan for the subject vehicle, Genesee Regional has established its continuing security interest. That security interest of the lender continues in the collateral notwithstanding its sale (UCC 9-315 [a] [1]) and is effective against purchasers of the collateral (UCC 9-201 [a]), unless the secured party authorized the disposition free of the security interest (UCC 9-315 [a] [1]), or the transfer was to a buyer in the ordinary course of business.
The agreement here authorizes the owner to sell the collateral without the lender’s consent to buyers in the ordinary course of business. (Security agreement No. 7—sale of collateral.) A sale is defined by UCC 2-106 (1)—“A ‘sale’ consists in the passing of title from the seller to the buyer for a price.”
And UCC 9-320, “Buyer of Goods,” provides: “(a) Buyer in ordinary course of business ... [A] buyer in ordinary course of business . . . takes free of a security interest created by the buyer’s seller . . . .”
Here the buyer’s assertion of section 9-320 for a security free transfer of title fails in two respects: (1) the title never transferred to buyer, and (2) Kimberly Palumbo was not a buyer in the ordinary course of Page One’s business.
No Title Transfer from Page One to Kimberly Palumbo
Although pursuant to section 9-320 (a) the transfer of title to a buyer in the ordinary course of business takes free of a security interest created by the buyer’s seller, that rule is not applic *832 able where, as here, the title was never transferred. Further, although the Maryland and New York certificates of title are prima facie evidence of the transfer since such recording requires filing of the title document (15 NYCRR 78.11 [a] [1]-[14] [v]; [15] [ii]; [¶] [1], [2], [3]), they are not dispositive of the issue of title transfer. (Green v Arcadia Fin., 174 Misc 2d 411, 412 [Sup Ct, Erie County 1997].) Here, there is no dispute that the vehicle’s title document was never procured from the lender, and never signed over to the buyer, Kimberly Palumbo. The “obligation” is upon the buyer of a used vehicle to “independently verify the authenticity of the documents.” (Chowdhury v Diamond Fin. Co. Inc., 2002 NY Slip Op 40509[U], *3 [Nassau Dist Ct 2002].) The buyer here knew before the Maryland certificate of title application that neither she nor the seller had the title document necessary to transfer such title. To obtain a certificate of title, the ownership document must be filed. (Vehicle and Traffic Law § 2105; 15 NYCRR 78.11 [a] [1]-[14] [v]; [15] [ii]; [¶] [1], [2], [3].) Absent possession, signing, and delivery of the title document, title is not transferred. (Sheridan Suzuki v Caruso Auto Sales, 110 Misc 2d 823 [Sup Ct, Erie County 1981]; cf. Pugh v Hartford Ins. Group, 68 Misc 2d 1014 [Sup Ct, Monroe County 1972] [here the registration was the title document].)
Void Transfer
Further, if the transfer had actually occurred and the dealer and/or buyer used a forged title document, it would constitute a void transfer and would still not have conveyed title to the buyer. The purported title in the buyer would be void. (Alamo Rent-A-Car Inc. v Mendenhall, 113 Nev 445 [1997].) The dealer never perfected title transfer. (Sheridan Suzuki v Caruso Auto Sales, 110 Misc 2d 823, 826 [Sup Ct, Erie County 1981].)
Transfer by Sales Dealer with Voidable Title—Not in the Ordinary Course of Business
If the transfer had actually occurred and the dealer and/or buyer used the actual title document procured from the lender by Page One through false pretenses or a bad check, or possibly by procurement of a duplicate original, and delivered and signed it over to the buyer, Kimberly Palumbo, it may have resulted in a transfer of good title to the buyer free of Genesee Regional’s security interest, provided the transferee was a buyer in the ordinary course of the dealer’s business. (Sheridan, supra at 826; Seely v First Bank & Trust, Boynton Beach, Fla., 64 Misc 2d 845, 848-849 [1970] [valid transfer where the registration is *833 the title document in New York and the certificate of title is the title document in Florida and lender consents to New York transfer even though it retains the original Florida certificate of title, but not the registration].) However, here the sale was not one in the ordinary course of plaintiffs business. A buyer in the ordinary course of business is more restrictive than a “good faith purchase for value.” (UCC 1-201 [9] [“A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller’s own usual or customary practices . . .”].)
Here, the vehicle was a new one by definition (Vehicle and Traffic Law § 415 [1] [h]; 15 NYCRR 78.13 [a]), and the dealer had no authority to sell new vehicles in its business operation and was explicitly prohibited from engaging in such sales without a certificate of registration as a new motor vehicle dealer. (Vehicle and Traffic Law § 415 [1] [f|; [3] [a], [b].) The Department of Motor Vehicles made this latter finding of unauthorized sale of a new vehicle, which finding is binding on Page One, and of which finding based on judicial admission the dealer is estopped from refuting. (Findings, Notice of Revocation and Civil Penalty; Hempstead Bank v Andy’s Car Rental Sys., 35 AD2d 35, 40 [2d Dept 1970]; Siegel, NY Prac § 457, at 769 [4th ed 2005]; Prince, Richardson on Evidence § 8-215 [Farrell 11th ed].)
Further, there are a number of other undisputed facts which would disqualify the sale as “usual or customary practices” as a matter of law, such as the illegal use of the dealer’s registration beyond the five-day allowable period (Vehicle and Traffic Law § 416; Getz v Searles, 265 AD2d 839 [4th Dept 1999]), and the use of a dealer’s second false retail installment contract with false MV-50 statements (15 NYCRR 78.11 [a] [5], [10], [11]; 78.13 [a]). (See charges 2, 3, and 4 in Findings [supra] and renumbered in Notice of Revocation and Civil Penalty as 1, 2, and 3.) Further, it is not customary for a dealer to refinance for a prior buyer in this manner several months after the sale and payment was allegedly completed. Neither has the dealer or buyer shown that it is in the dealer’s ordinary course of business to file a title transfer in a different state, while the buyer still resided in New York State, the auto and title document were still located in New York State, and the transfer was still subject to New York law and its filing requirements. Lastly, both parties were aware that the lender still retained the title document to the vehicle.
*834 Security Interest of Xerox
Xerox never had a perfected security interest since there was no title transfer to Kimberly Palumbo underlying the Maryland certificate of title upon which the filed security interest is based. “[T]he exclusive method [in New York] for perfecting a security interest in a titled vehicle” is accomplished by the “ ‘delivery to the commissioner of the existing certificate of title, if any, an application for a certificate of title containing the name and address of the lienholder and the required fee.’ ” (Matter of Cooley, 2001 WL 135822, *2, 2001 US Dist LEXIS 1513, *5-6 [WD NY, Feb. 13, 2001] [failure to deliver the title transfer document]; 15 NYCRR 20.15, 78.11 [¶] [3].) Accordingly, Xerox and Genesee Regional Bank each had an unperfected security interest in the vehicle. In such cases, the UCC provides that priority is given to the first created (UCC 9-322), which in this instance was Genesee Regional Bank. However, in lieu thereof, or of an evaluation of Genesee Regional’s judgment lien priority, if any, the parties have submitted their own stipulation as to the agreed distribution of proceeds in the event Genesee Regional is successful in obtaining the vehicle.
Causes of Action
Defenses of Buyer and Assignee
If Kimberly A. Palumbo was duped by her husband into believing she would obtain good title she would have a cause of action against the dealer for breach of contract and warranty of title (UCC 2-312 [3]; Green, supra at 413) and a defense against the retail installment contract assignment by the dealer to Xerox. (UCC 9-404.) Likewise, Xerox, of course, would also have recourse against the dealer for its breach of contract and the false statements contained in its February 2004 assignment. (UCC 2-312.)